UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. ________________________

UNITED STATES OF AMERICA,

Plaintiff,

v.

ONE HUNDRED FORTY-SIX MILLION
FIVE HUNDRED THOUSAND DOLLARS
($146,500,000.00) IN UNITED STATES CURRENCY,

Defendant.
______________________________________________/

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

The United States of America brings this claim against the defendant $146,500,000.00 in Funds (the "defendant funds"), and alleges as follows:

JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C) and Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions.

2. This court has subject matter and *in rem* jurisdiction over the matter under 28 U.S.C. §§ 1345 (action commenced by the United States) and 1355(a) and (b) (action for forfeiture

which may be brought in the district where any of the acts giving rise to forfeiture occurred), respectively.

3. Venue lies in this district pursuant to 28 U.S.C. §§ 1355 and 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America ("the government").

5. The defendant is $146,500,000.00 in Funds paid by the Western Union Company ("Western Union") pursuant to a deferred prosecution agreement with the government. Under the terms of the agreement, Western Union has agreed not to contest the forfeiture of the defendant funds. The government is unaware of any other potential claimants to the defendant funds.

6. The defendant funds are in the custody of the United States Marshals Service, where they shall remain subject to this court's jurisdiction during the pendency of this action.

## FACTS SUPPORTING FORFEITURE

### Introduction

7. This complaint arises from the government's investigation of a fraudulent scheme operated through and facilitated by Western Union Agents from as early as 2004 through 2012, in this district and others.

8. At all times relevant to this Complaint, Western Union operated as a financial institution as that term is defined in 31 U.S.C. § 5312(a)(2)(R) and 31 C.F.R. § 1010.100. More specifically, Western Union is and was a money services business ("MSB") and is one of the largest MSBs in the world.

9. Western Union's "Money Transfer System" is an electronic network operated and controlled by Western Union using servers in the United States. Through the Money Transfer System, consumers are able to send money to other individuals in the United States and around

the world. Western Union offers its money transfer services to consumers via approximately 550,000 Western Union Agent locations operating in more than 200 countries and territories. Approximately 90 percent of Western Union Agent locations are located outside the United States. In 2014, more than 150 million individual consumers used Western Union's Money Transfer System to send more than $85 billion through Western Union's Agent locations.

10. "Western Union Agents" or "Agents" are generally independent individuals or entities, including banks, post offices, and small independent shops, who have entered into a contractual relationship with Western Union. By virtue of that contractual relationship, Agents are authorized to offer Western Union's money transfer services to consumers. Each Agent location has authorized access to the Money Transfer System and is required to use it to send and receive all Western Union transfers in which it is involved.

11. "Fraudsters" include, among other individuals involved in the fraud scheme, certain owners, operators and employees of Western Union Agents.

12. A customer sending money through an Agent would visit an Agent location and provide the Agent information that generally included the sender and payee names, the transfer amount, and the state or province and country where the money was to be sent. The sender's identification was sometimes also required. The Agent would enter the information into the Money Transfer System, which would generate a Money Transfer Control Number ("MTCN"), a 10-digit reference number used to identify and track that particular transaction.

13. To receive the transfer, the payee was typically required to visit an Agent location in person and provide his or her name, address, telephone number, the sender's name and location, and the transfer amount. Payees were sometimes asked to produce a government-issued identification, and were typically asked to provide the MTCN associated with the transfer. Money

transferred through the Money Transfer System can be received within minutes of the transfer, depending on the location and payment method.

The Fraudulent Scheme

14. During all relevant times, Western Union recorded complaints from U.S. victims reporting the fraud scheme in what are known as Consumer Fraud Reports ("CFRs"). The CFRs contained detailed information about the victims, the transactions, and the Western Union Agent locations that paid the transfers. Western Union used the CFRs to track and investigate Agent locations that paid transfers reported as fraud-induced.

15. Starting in 2004 and ending in December 2012, Western Union violated U.S. laws by aiding and abetting Fraudsters in their unlawful schemes by remaining in business with Agent locations that facilitated the unlawful fraud scheme. Further, Western Union employees (1) repeatedly identified Agent locations involved in or facilitating fraud-related transactions but knowingly failed to take effective corrective action; (2) repeatedly identified Western Union Agents involved in or facilitating unlawful structuring but knowingly failed to take effective corrective action; (3) failed to adequately implement and maintain effective policies and procedures to discipline, suspend, terminate or take effective corrective action against Agent locations that repeatedly violated the Bank Secrecy Act or other statutes; (4) modified compliance reviews or results so that Agents with severe compliance failures would not face disciplinary action such as suspension or termination as required by Western Union policies or practices; (5) failed to take effective action to control transactions with characteristics indicative of illegal gaming; or (6) failed to file Suspicious Activity Reports identifying Agents as suspicious actors. The fraud scheme involved the making of a variety of false promises and representations made for the

purpose and with the intent of inducing victims in this district and others to send money through Western Union, in violation of 18 U.S.C. § 1343 (wire fraud).

16. The scheme operated generally as follows: a Fraudster would make contact with a victim by phone, U.S. mail, interstate courier, or the Internet, and induce the victim to send money to the Fraudster through false promises and representations, including the following:

a. Promises that the victim was eligible to receive a large cash prize, lottery winnings, a loan, or other payment;

b. False offers that the victim was eligible to purchase various high-ticket items for sale over the Internet at deeply discounted prices;

c. False promises of employment opportunities to become "secret shoppers," who would be paid to evaluate retail stores; or

d. A false claim that the Fraudster was a relative of the victim, or was acting on behalf of or for the benefit of such a relative, and was in some kind of trouble and in urgent need of money.

17. The Fraudster would then instruct the victim that it was necessary for the victim to send money to obtain the promised benefit or provide the needed relief. The Fraudster would then direct the victim to send the advance payment using Western Union's Money Transfer System. After the victim sent the money through the Money Transfer System according to the Fraudster's instructions, he or she would provide the MTCN to the Fraudster, who would visit an Agent location including locations that were controlled or staffed by individuals who were complicit in the fraud, and obtain the money.

18. The complicit Western Union Agent locations facilitated the scheme by, among other things, knowingly entering into the Money Transfer System false addresses, telephone

numbers, and personal identification document information for the payee Fraudsters or their associates. This allowed the Fraudsters to receive the money or retransfer the funds to other complicit Western Union Agent locations without creating a reliable record of who actually received the funds transferred from the victim. In return for their assistance in concealing the true identities of the Fraudsters and their involvement in the scheme, the complicit Agents received kickbacks from the Fraudsters, generally drawn from the victim funds transferred.

19. At no time did the Fraudsters intend to provide the promised benefits to the victims, or the promised relief to family members purportedly in need of assistance. Indeed, with respect to the latter, the claimed distress and need for assistance was entirely illusory. Nevertheless, the victims, in reliance upon the false promises and representations, made the money transfers, but in fact did not receive either the return of their transferred funds or the benefits promised to them. Western Union maintained a 1-800 number through which many of the victims of the scheme reported their losses. These reports were memorialized by Western Union in CFRs, which contained detailed information about the victims, the fraudulent transactions, and the Agent locations where the payees received the transferred funds. The CFRs were maintained by Western Union in a database and Western Union purported to use that information to identify, track and investigate Agent locations where transfers had been reported as having been induced by fraud. However, in reality, Western Union failed to suspend and/or terminate Agents complicit in the fraud scheme and allowed those Agents to continue to process fraudulent transactions.

20. Between 2004 and 2012, the CFRs created by Western Union showed more than $500,000,000.00 in reported fraud transactions involving the Money Transfer System, and Western Union knew that not all victims of the scheme reported their losses. Western Union employees knew, as a result of the company's own internal reports and analyses regarding

particular Agent locations throughout the world that the total amount of loss attributable to the scheme was higher than the amount reflected in the CFRs.

21. Western Union was aware that some of its Agents had been criminally charged for their involvement in the scheme. Dozens of Western Union Agents and their criminal associates were criminally charged for their participation in the scheme described herein, using the Western Union Money Transfer System.

22. Western Union itself identified numerous Agent locations — particularly overseas Agent locations — that processed high numbers of fraud-induced transfers from victims across the United States, including Agent locations that Western Union suspected were complicit in the fraud scheme.

23. Western Union aided and abetted the scheme by failing to take sufficient action to stop these Agents from continuing to participate or facilitate the scheme. Moreover, Western Union's failure to take corrective action despite this knowledge was in violation of provisions of the Bank Secrecy Act that required Western Union to monitor international Agents and intervene where such Agents were believed to be involved in violations of applicable laws or regulations.

24. While some Western Union employees recommended corrective actions in the form of policies and procedures that might have addressed the scheme, and recommended specific discipline against certain Western Union Agent locations, Western Union failed to act on those recommendations.

a. For example, as early as 2004, an employee in Western Union's Corporate Security Department drafted proposed Global Guidelines that provided for the investigation of any Agent location that was the subject of ten CFRs within a 60-day period, and suspending any such Agent that was subject to five additional CFRs within the next 60 days. Western Union failed to

adopt this proposed policy. Had it done so, Western Union would have suspended or terminated more than 2,000 Agents worldwide, preventing significant losses to victims.

b. As early as 2005, Western Union's Corporate Security Department used CFRs to generate a regular 60-day Fraud Report, identifying Agent locations that were the subject of five or more CFRs within a 60-day period. Despite warnings that repeated inclusion in the Fraud Report would result in suspension of certain Agent locations, and that such locations were required to "drastically reduce" their handling of such transactions, no such disciplinary action was taken against such locations.

25. While the fraud scheme described herein was global in scope, reaching foreign countries including the United Kingdom, Spain, Mexico and Peru, most of the fraud occurred, and most of the victims of the scheme were located, in the United States, including in the Southern District of Florida. The following are typical examples of how victims were defrauded as part of this scheme. Each of the examples below represents victims who were defrauded through Agents that would have been disciplined, suspended, or terminated had Western Union implemented the proposed Global Guidelines. .

a. A Fraudster contacted a victim in the Southern District of Florida, and falsely promised that the victim would receive a prize if he paid money in advance. The victim followed the Fraudster's instructions and transferred $1,150.00 through Western Union. The money was picked up the next day at a Western Union Agent in Spain. The victim never received the promised prize.

b. Fraudsters falsely promised three victims in the Southern District of Florida that they would receive goods at a reduced price through an internet sale. The victims followed the Fraudster's instruction and sent $2,700.00, $2,800.00, and $2,000.00, respectively through

Western Union. The funds were picked up at an Agent locations in London, England but the victims never received the promised goods.

c. A Fraudster contacted a victim in the Southern District of Florida and falsely represented that a member of the victim's family was in trouble abroad and needed money. The victim followed the Fraudster's instructions, and sent $5,200.00 through Western Union to help the relative. The money was picked up at an Agent location in Mexico, but the victim's family member was not, in fact, in trouble. The money was never recovered.

<u>The Deferred Prosecution Agreement</u>

26. On or about January 19, 2017, the government and Western Union entered into a Deferred Prosecution Agreement ("DPA") based on the government's investigation of the pattern of activity described above. In the DPA, Western Union admitted, accepted and acknowledged, among other things, that it was responsible under United States law for the acts of its officers, directors, and employees, as well as for certain conduct of its Agents.

27. Western Union further acknowledged and agreed that at least $586,000,000.00 in consumer fraud proceeds were (a) traceable to transactions involved in the scheme described herein; (b) generated as the result of the scheme to violate 18 U.S.C. § 1343 between 2004 and 2012; and (c) subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

28. Western Union further agreed to pay to the United States the sum of $586,000,000.00, which funds were to be forfeited to the United States as proceeds of the scheme described herein. To the extent that the monies to be paid to the government were not the actual proceeds of the underlying offense(s), Western Union agreed that the monies paid would be treated as a substitute res, to be treated as though they were the actual proceeds of the scheme described herein.

29. Western Union has made the payment called for in the DPA, and the above-captioned defendant funds are a portion of the total amount so paid.

## CLAIM FOR FORFEITURE

30. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture by the United States. "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B) to include, among other things, offenses in violation of 18 U.S.C. § 1343. The term "proceeds" includes "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from this offense." 18 U.S.C. § 981(a)(2)(A).

31. The defendant funds constitute and are derived from proceeds traceable to specified unlawful activity, specifically a scheme to commit wire fraud, or are a substitute res for such proceeds. As a result, the defendant funds are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the defendant funds;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) this Court decree forfeiture of the defendant funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and

proper, together with the costs and disbursements of this action.

Respectively submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

BY: [signature]

ROGER W. POWELL
RANDY KATZ
ASSISTANT U.S. ATTORNEY
Roger.Powell@usdoj.gov
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, Florida 33394
Tel: (954) 356-7255 ext. 3592
Fax: (954) 356-7180
Fla Bar No. 341411

DEBORAH CONNOR
Acting Chief, Money Laundering and Asset Recovery Section
U.S. Department of Justice
Criminal Division

PAMELA J. HICKS
Chief, Money Laundering & Forfeiture Unit
MARGARET A. MOESER
Trial Attorney

**VERIFICATION**

I, , Special Agent, United States Internal Revenue Service hereby declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture in Rem is based upon information known to me, and that the facts alleged therein are true and correct to the best of my knowledge and belief.

EXECUTED, on this 1 day of June 2017.

Tricia E. Turner

TRICIA E. TURNER
SPECIAL AGENT
INTERNAL REVENUE SERVICE